**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| In re WIRELESS TELEPHONE<br>911 CALLS LITIGATION | )<br>)<br>)<br>)<br>)<br>) | MDL-1521<br>03 C 2597 |
| VISHAL AGGARWAL and BRIDGET<br>BYRNE, on behalf of themselves<br>and all others similarly situated,<br><br>          Plaintiffs,<br><br>v.<br><br>NOKIA CORPORATION and AT & T<br>WIRELESS SERVICES, INC.,<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 02 C 8808 |

**MEMORANDUM OPINION**

Before the court are several motions: (1) defendants' motion for "partial" summary judgment; (2) defendants' motion to dismiss the amended complaint; (3) the carrier defendants'[1] motion to dismiss the amended complaint; (4) defendant Nokia, Inc.'s motion to dismiss the amended complaint; and (5) defendant Nokia Corp.'s motion to dismiss the amended complaint for insufficiency of service of process. For the reasons stated below, defendants' motion for partial summary judgment is granted in part and denied in part; defendants' motion to dismiss is granted in part and

---

[1] The "carrier defendants" are Cellco Partnership d/b/a Verizon Wireless, AT & T Wireless Services, Inc., and Sprint Spectrum L.P. d/b/a Sprint PCS.

denied in part; the carrier defendants' motion to dismiss is granted in part and denied in part; defendant Nokia, Inc.'s motion to dismiss is granted; and defendant Nokia Corp.'s motion to dismiss the amended complaint is denied.

## **BACKGROUND**

In this multidistrict litigation, plaintiffs contend that the wireless telephones manufactured and sold by defendants fail to comply with the Second Report and Order of the Federal Communications Commission ("FCC") concerning the revision of the FCC's rules to ensure compatibility with Enhanced 911 emergency calling systems.[2] In the Second Report and Order, the FCC approved three "call completion" methods for processing wireless calls (in analog mode) to 911. One of those methods is called "Automatic A/B Roaming-Intelligent Retry," also known as "A/B-IR." The FCC required that a handset using the A/B-IR method meet two conditions in order to address the problem of delays in connecting to 911: (1) "provide effective feedback to inform the user when 911 call processing is underway and has not finished"; and (2) "seek to complete the call with the non-preferred cellular carrier if the preferred cellular carrier has not successfully delivered the call to the landline carrier within 17 seconds after the call is placed." (Second Report and Order, ¶¶ 39-41.) The primary

---

[2] _In re_ _Revision of the Commission's Rules to Ensure Compatibility with_ _Enhanced 911 Emergency Calling Systems_, 14 F.C.C.R. 10954 (1999) ("Second Report and Order").

contention of plaintiffs' initial class action complaint was that

defendants' phones did not comply with the second requirement--the

"17-Second Rule."[3]

Defendants moved for a stay of this action pursuant to the

doctrine of primary jurisdiction, arguing that we should apply the

doctrine because the Second Report and Order is ambiguous as to

what "call completion" means and therefore ambiguous as to exactly

what act must be performed by the handset in 17 seconds.

Defendants argued that "call completion" occurs when a handset

receives a voice channel assignment. Plaintiffs, however,

contended that the Second Report and Order clearly and

unequivocally indicates that a call is "complete" when it is

_____

[3] Our statement in the Memorandum Opinion of September 3, 2003 that
"[p]laintiffs contend that defendants' phones do not comply with . . . the '17-
Second Rule'" could be read to imply that plaintiffs did not contend that the
phones failed to provide effective feedback. Plaintiffs' initial class action
complaint did allege, however briefly, that the phones "failed to provide an
audio notification that the 911 call was in progress." (Class Action Complaint,
Aggarwal v. Nokia, 02 C 8808, ¶ 13.) The focus of the proceedings in this case
has been the 17-Second Rule and very little, if any, mention has been made of the
feedback requirement. Our referral of issues to the FCC concerned only the 17-
Second Rule, and therefore, the instant motion for partial summary judgment has
nothing to do with the feedback requirement. It is puzzling (but not exactly
surprising), then, that in addition to seeking "partial" summary judgment in
relation to the 17-Second Rule, defendants also contend that summary judgment is
"appropriate on all of Plaintiffs' claims premised on the allegation that
wireless phones must provide visual and audio feedback that they are operating
in 911 mode." (Motion for Summary Judgment at 7.) Defendants are incorrect; we
did not refer the feedback requirement issue to the FCC, we did not invite a
summary judgment motion on the issue, and it is not properly before the court as
a subject for summary judgment. In their consolidated amended class action
complaint, plaintiffs have abandoned any claim that the phones fail to provide
effective feedback. Plaintiffs confirm in their response to the summary judgment
motion that they "do not claim Defendants violated the 'effective feedback'
rule." (Memorandum in Opposition to Motion for Summary Judgment at 1-2 n. 2.)
It is well settled that an amended complaint supersedes the prior complaint,
rendering the latter a nullity. See Kelley v. Crosfield Catalysts, 135 F.3d
1202, 1204-05 (7th Cir. 1998); Lubin v. Chicago Title & Trust Co., 260 F.2d 411,
413 (7th Cir. 1958). Accordingly, defendants' motion for summary judgment will
be denied to the extent that it seeks judgment on the feedback requirement issue.

delivered to the landline phone system.  The relevant language of the Second Report and Order is as follows:

- "In general terms, the handset should seek to complete the call with the non-preferred cellular carrier if the preferred cellular carrier has not successfully delivered the call to the landline carrier within 17 seconds after the call is placed."

- "The 17-second period is also generally consistent with the combined time periods for two basic call processing tasks that must be performed and completed if a call attempt is to be successful after the call is sent: in the first task, a handset waits up to 12 seconds to receive a voice channel assignment from a base station; in the second task, the base station waits up to 5 seconds to receive a voice channel transmission from the handset."

- "After a handset receives a voice channel assignment and begins transmission to a base station on that channel, Conversation State is reached.  As noted, however, at this stage, the handset's voice channel transmission has not necessarily been received at the base station, and thus the handset may not necessarily be able to use the voice channel to communicate with the base station (and thence to the landline network).  In establishing a time limit for delivering the call to the landline carrier, we are seeking to ensure that communication between the handset and base station on the voice channel goes beyond Conversation State and reaches the point where the handset's voice channel transmission is indeed received at the base station."

(Second Report and Order, ¶ 41 & n.52.)

We disagreed with plaintiffs and found that it is not clear from the Second Report and Order exactly what act must be performed by the handset in 17 seconds.  The intricacies of cellular call

technology led us to conclude that resolving the ambiguities of the Second Report and Order is not within our conventional expertise, but is within the FCC's field of expertise.  The FCC was, after all, the author of the very report whose meaning was in dispute. Mindful of the possibility of inconsistent rulings, we reasoned that a consistent and uniform rule is necessary and that judicial economy would be served by having the FCC resolve the issue. Therefore, we granted defendants' motion to stay the action pursuant to the doctrine of primary jurisdiction and referred the issues of what is meant by "call completion" and "delivery of the call to the landline carrier" and exactly what action must be performed by the handset in 17 seconds to the FCC for its consideration and decision.[4]

In an order dated July 22, 2004 (the "Clarification Order"), the FCC issued its answers to our questions.[5]  Thereafter, we asked the parties for statements of their positions regarding the impact of the FCC's order on the further conduct of this litigation. According to defendants, the Clarification Order confirmed their interpretation of the Second Report and Order and warranted dismissal of plaintiffs' cases.  Plaintiffs filed a motion for leave to file a consolidated amended complaint, which we granted.

---

[4]  We also denied plaintiffs' motion for class certification without prejudice to refiling once the stay was lifted.

[5]  We set forth relevant portions of the Clarification Order in our Discussion, <u>infra</u> section A.

In the amended complaint, plaintiffs now allege that defendants' phones fail to satisfy at least one of the following requirements of the Second Report and Order and the Clarification Order: (1) if a cell phone attempting to place a 911 call does not detect a signal from the preferred carrier, it must switch to the non-preferred carrier and attempt to complete the call; (2) if the cell phone detects a signal from the preferred carrier but is not assigned a voice channel within 17 seconds, it must switch to the non-preferred carrier and attempt to complete the call; and (3) if a wireless 911 call is completed but dropped, the cell phone must automatically retry the call. (Consolidated Amended Class Action Complaint, ¶ 40.)

We held a status hearing on October 5, 2004 to discuss the impact of the FCC's ruling. We indicated to the parties that even though plaintiffs were filing an amended complaint containing new allegations that were not encompassed by the FCC's Clarification Order, we were inclined to enter some type of order recognizing the FCC's decision as the law of the case and of all the transferred cases in this multidistrict litigation. We suggested that defendants file a motion for partial summary judgment based on the FCC's decision, using the phrase "partial summary judgment" as shorthand for a pretrial order to the effect that the FCC's

decision regarding the 17-Second Rule would be the law of the case.[6]

Defendants then filed a motion for summary judgment (actually a motion for "partial" summary judgment), which is now pending before us as well as four motions to dismiss the amended complaint.

## DISCUSSION

### A.   Defendants' Motion for Partial Summary Judgment

In response to our referral of the aforementioned issues to the FCC for its consideration and decision, the FCC issued a thoroughly reasoned and detailed order, the Clarification Order. The FCC answered our questions as follows:

**1.   What is meant by "call completion?"**

Within the context of the A/B-IR call processing mode, "call completion" occurs when the handset receives a valid voice or traffic channel assignment and tunes to the assigned channel. If the handset has not received a voice channel assignment within 17 seconds on the preferred carrier's system, the handset must attempt to set up the call on the non-preferred carrier's system.

**2.   What is meant by "delivery of the call to the landline carrier?"**

This refers to the further stage of call processing, after the call is delivered to the wireless carrier's base station, when the call is routed by the wireless carrier through its switch and onto trunks linking that switch to facilities of the local wireline carrier. In

---

[6]   After denying a motion for summary judgment, a district court may, pursuant to Rule 56(d), issue an order "specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy." Fed. R. Civ. P. 56(d); see also Occidental Fire & Cas. Co. v. Continental Bank, 918 F.2d 1312, 1320 (7th Cir. 1990) (noting that under Rule 56(d) the trial court may enter a binding order "listing the facts that are not in dispute").

the case of 911 calls, the call will typically be routed
by the wireline carrier to a switch called a selective
router, which identifies the PSAP [Public Safety
Answering Point] designated to handle calls from the area
where the call was received and delivers the call to that
PSAP. The references to "delivery of the call to the
landline carrier" in the [Second Report and Order]
expressed the Commission's expectation that the A/B-IR
mode would improve overall 911 call completion, including
improving the likelihood that 911 calls will be received
by the PSAP. However, the "delivery of the call to the
landline carrier" stage of call processing is not
relevant to the operation of A/B-IR mode or to compliance
with the 17 second condition.

**3. What action must be performed by the handset in 17
seconds?**

During the 17 second period, a handset using the A/B-IR
method must override any features which prevent scanning
of either the A side or B side carrier control channels,
and scan the control channels of the handset's preferred
carrier setting, either A or B. If the handset does not
detect a signal from the preferred carrier, the handset
must then retry the call with the non-preferred carrier.
If the handset does detect a signal (*i.e.*, forward
control channel) from the preferred carrier, the handset
must attempt to complete the call with the preferred
carrier by requesting assignment of a voice channel. If
the handset receives a voice or traffic channel
assignment and tunes to the assigned voice channel, the
call is deemed completed. If the initial call set-up
attempts with the preferred carrier fail, because a voice
channel is not assigned within 17 seconds, the handset
must terminate its call set-up attempts with the
preferred carrier and retry to set up the call with the
non-preferred carrier. The handset may meet the 17
second condition in any of several ways, including
limiting the number of initial call attempts or setting
an overall time limit for initial call attempts to the
preferred carrier.

(Clarification Order, ¶¶ 31-33.)

Defendants argue that the FCC's ruling, which confirms their

interpretation of the 17-Second Rule, is binding on this court

pursuant to the doctrine of primary jurisdiction, warranting
partial summary judgment.[7]  Plaintiffs, on the other hand, contend
that we are not bound by the FCC's ruling, but rather that the
ruling is subject to review for reasonableness.  In plaintiffs'
view, the FCC's answers in the Clarification Order are unreasonable
because they contradict the "clear language" of the Second Report
and Order.  (Memorandum in Opposition to Motion for Summary
Judgment at 8.)

    It is not necessary to decide the question of whether we are
bound by the Clarification Order;[8] assuming we are not bound, and

---

[7]  In their Reply, defendants also maintain that "by adopting the FCC's
explanation of the 17 Second Condition in the Amended Complaint, Plaintiffs have
conceded that the FCC's rationale in the Clarification Order is reasonable" and
that this is a "judicial admission" by plaintiffs.  (Reply at 4.)  The argument
is specious.  It is too much of a leap to transform the amended complaint's
simple description of what the FCC purported to do in the Second Report and Order
and the Clarification Order into a "concession" or "judicial admission" that the
FCC's rationale was reasonable.

[8]  Plaintiffs are correct that we referred issues to the FCC under the
"second" form of primary jurisdiction described in Arsberry v. Illinois, 244 F.3d
558, 563 (7th Cir. 2001).  The Seventh Circuit distinguished the "central and
original form" of primary jurisdiction, "exclusive agency jurisdiction," from the
second form of primary jurisdiction as follows:

    The doctrine of primary jurisdiction is sometimes defined quite
    differently, as a doctrine that allows a court to refer an issue to
    an agency that knows more about the issue, even if the agency hasn't
    been given exclusive jurisdiction to resolve it.  So, for example,
    we read . . . that "the doctrine of primary jurisdiction allows a
    federal court to refer a matter extending beyond the 'conventional
    experiences of judges' or 'falling within the realm of
    administrative discretion' to an administrative agency with more
    specialized experience, expertise, and insight." . . . *In such
    cases, either court and agency have concurrent jurisdiction to
    decide an issue, or only the court has the power to decide it, and
    seeks merely the agency's advice.*

244 F.3d at 563-64 (emphasis added).  We are unsure about whether the FCC's
answers to our questions are subject to our review or if so, what is the
appropriate standard of review.
    In the case of In re Starnet, Inc., 355 F.3d 634, 639 (7th Cir. 2004), the
Seventh Circuit itself referred a matter to the FCC under the primary
jurisdiction doctrine to "resolve the ambiguity created by the word 'location'"

thus required to review the Clarification Order for reasonableness, the Order passes muster.  We reject plaintiffs' argument that the Clarification Order is inconsistent with the "unequivocal" Second Report and Order and represents a "change" in FCC rulemaking.  In fact, in our previous memorandum opinion that referred these matters to the FCC, we already rejected plaintiffs' argument that the Second Report and Order is "clear."  The language of the Second Report and Order is ambiguous regarding what a handset must do in 17 seconds (and we explained the ambiguity in our memorandum opinion); that was the whole point of the referral.  To determine what the FCC meant, there was no better resource than the FCC itself.

In the Clarification Order, the FCC undertook a diligent, reasoned, and comprehensive examination of its own language.  Its answers to our questions, quoted <u>supra</u>, make sense to us,

_____

in the Telecommunications Act and a Report and Order implementing the statutory provision.  The Court noted: "Only the FCC can disambiguate the word 'location'; all we could do would be to make an educated guess.  And although the FCC's position would be subject to review by the judiciary for reasonableness, the agency's views are the logical place for the judiciary to start."  355 F.3d at 639.  Plaintiffs cite <u>Starnet</u> for the proposition that this court should review the Clarification Order for reasonableness.  Defendants point out that Courts of Appeals have exclusive jurisdiction to enjoin, set aside, suspend, or determine the validity of all final FCC orders made reviewable by 47 U.S.C. § 402(a).  <u>See</u> 28 U.S.C. § 2342(1).  47 U.S.C. § 402(a) provides that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the [FCC] under this chapter . . . shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28."  We question whether the exclusive jurisdiction provision would even apply here, though, because the referral to the FCC and these subsequent proceedings to determine the effect of the FCC's answers do not appear to qualify as a "proceeding to enjoin, set aside, annul, or suspend" an FCC order.  47 U.S.C. § 402(a) does not seem to contemplate or apply to the type of FCC "order" we have in this case that was generated by a referral to the agency pursuant to the doctrine of primary jurisdiction.  In any case, we need not decide the issue, as explained <u>infra</u>.

especially in light of the FCC's sound analysis of its own language
and intent:

> [W]e clarify that the 17 second condition requires that
> the handset retry an initial 911 call attempt with the
> non-preferred carrier if the handset is not assigned a
> voice channel by the preferred carrier within 17 seconds.
> . . .
> [I]n general, under the analog standard . . ., as well as
> under the A/B-IR algorithm, when the handset receives a
> valid voice or traffic channel assignment and tunes to
> the assigned voice channel, call set-up is considered
> "completed." In other words, the call completion has
> occurred. In the [Second Report and Order], the
> Commission did not change this common understanding of
> when the completion of call set-up occurs, but rather
> took notice of it as a concern.
> . . .
> [I]t is reasonable to conclude that the Commission did
> not mandate that the handset, after completing the call
> set-up, monitor the channel and ensure that the call
> indeed transmitted to the landline. Such a requirement
> would necessitate technical changes to analog operations
> and existing standards as well as changes to wireline or
> wireless network control procedures and functions which
> the Commission clearly did not intend.
> . . .
> The Commission concluded . . . that "a time limit should
> be placed on the initial attempt to *set-up* the call with
> the preferred carrier," and that 17 seconds would be "a
> reasonable and achievable maximum time period." . . .
> The Commission explained that in general, a call would
> take a maximum of 17 seconds to process, (*i.e.*, 12
> seconds to receive a voice channel assignment from the
> base station and 5 seconds for the base station to
> receive a voice channel assignment transmission from the
> handset). Because of that, the 17 seconds is also a
> sufficient amount of time to adequately determine whether
> a call could have been delivered to the landline carrier,
> by the preferred carrier . . . . Accordingly, the
> Commission found that waiting a maximum of 17 seconds
> before triggering the obligation to retry the call with
> the non-preferred carrier is a reasonable and achievable
> maximum time period.
> . . .

The 17 second time limit applies to the initial "call set-up" attempts between the handset and the preferred carrier's base station, not to the further stages of call processing (*i.e.*, delivery of the call to the landline from the base station).

. . .

Although the court found that the Second Report and Order is ambiguous, it is reasonable to conclude that the Commission did not mandate that the call must be delivered to the landline carrier within 17 seconds nor require that the handset verify that its voice channel transmission is indeed received at the preferred carrier's base station. The Commission did mention delivery of the call to the landline carrier in two places in the discussion of the A/B-IR method, but in context, those represent general statements describing 911 call completion objectives and the expected *effect* of the A/B-IR method. At no point, however, do these statements clearly indicate that the Commission was conditioning the approval of A/B-IR method on the successful development and incorporation into the A/B-IR method of all the technical changes necessary for a handset to monitor the call until it is successfully "delivered to the landline carrier."

. . .

In paragraph 41 [of the Second Report and Order], the Commission said that "[i]n general terms, the handset should seek to complete the call with the non-preferred carrier if the preferred cellular carrier has not successfully delivered the call to the landline carrier within 17 seconds after the call is placed." But using the phrase "[i]n general terms" as a preamble indicates that this language is descriptive of what the Commission expected that the A/B-IR call-processing mode would achieve in most circumstances, not a technical prescription of how the 17-second condition must operate. The use of the word "should" in this sentence, rather than "must" or "is required to," further establishes that this sentence was not intended to set a technical requirement for how the 17-second condition was to be met.

Footnote 52 in the [Second Report and Order] also refers to a time limit for delivering the call to the landline network, but this language similarly does not indicate that the Commission was prescribing a specific method by which the 17 second condition is to be achieved. The footnote says that "we are seeking to ensure that communication between the handset and base station on the

voice channel goes beyond Conversation State and reaches the point where the handset's voice channel transmission is indeed received at the base station." As discussed before, this language intended to explain the reasonableness of the 17 seconds as a maximum time sufficient to achieve a call set-up, in general, not to set a required technical procedure or method to determine that the call has been delivered to the landline carrier. Furthermore, the Commission expected that A/B-IR, as approved, could be implemented through limited changes in handset programming and operations. In evaluating A/B-IR, the Commission concluded that the method "requires only relatively modest changes in handset software that should not be unduly expensive and should not take long to incorporate into mobile units." In setting an implementation schedule, the Commission similarly understood that it would be relatively easy to begin to manufacture handsets incorporating such minor programming changes. . . . [R]equiring handsets to monitor whether a call has been transmitted and received by the wireline carrier would require substantial revamping of network equipment and practices as well as of wireless handsets. Such changes were neither contemplated nor required by the Commission in its approval of the A/B-IR method.

Although the language in paragraph 41 of the [Second Report and Order] might be considered ambiguous, it is reasonable to conclude that the Commission did not mandate that the call must be delivered to the landline carrier within 17 seconds, or the handset must have capability to verify that its voice channel transmission is indeed received at the base station. Such a requirement might have further improved 911 call completion rate, but the successful implementation of such a method would necessitate changes to wireless and wireline networks. We believe that the controlling language for the 17-second requirement is found in paragraph 38 [of the Second Report and Order] stating that the time limit may be met in several ways including a limit on the number of call attempts, and in paragraph 40 and elsewhere that the Commission sets a time limit (*i.e.*, 17 seconds) "on the initial attempt to set-up the call with the preferred carrier."

(Clarification Order, ¶¶ 9, 15, 17, 19-22, 22 n.64, 23-24

(citations omitted).) After carefully reviewing both the Second

Report and Order and the Clarification Order, we find the FCC's answers to the questions we referred to it to be eminently reasonable.

Plaintiffs also assert that defendants' motion for summary judgment should be denied pursuant to Federal Rule of Civil Procedure 56(f) because they have not been given the opportunity to take appropriate discovery. Plaintiffs contend that they are "entitled to discovery regarding Defendants' compliance with the 17 Second Requirement" and "wish to examine materials" "to assist in determining if the FCC's Answers to the Court's questions are reasonable." (Memorandum in Opposition to Motion for Summary Judgment at 14.) Plaintiffs are entitled to discovery regarding compliance with the 17-Second Rule, but only in relation to what they allege *in the amended complaint* about the Rule as it has been clarified in the Clarification Order, and the summary judgment motion does not go to the allegations of the amended complaint. No amount of additional discovery, though, would be appropriate or necessary in relation to our determination of whether the FCC's interpretation of its own language is reasonable. The type of discovery proposed by plaintiffs--documents tending to show defendants' or the FCC's prior "understanding" of the 17-Second Rule--is not material to the issue of the reasonableness of the Clarification Order and would not assist the court.

We will adopt the FCC's Clarification Order as the law of the case. Defendants' motion for partial summary judgment thus will be granted to the extent that it relates to the FCC's clarification of the 17-Second Rule, but it will be denied to the extent that it seeks judgment on the abandoned allegations regarding the feedback requirement, see <u>supra</u> n.2.

## B.  **Defendants' Motion to Dismiss**

We move on to defendants' motion to dismiss the complaint that is presently pending, the Consolidated Amended Class Action Complaint.  The amended complaint contains eleven counts: violation of the Communications Act of 1934 (the "Communications Act"), seeking injunctive relief under 47 U.S.C. § 401(b) (Count I); violation of the Communications Act, seeking damages under 47 U.S.C. §§ 206 and 207 (Count II); violation of California's unfair competition law (Counts III and XI); breach of the implied warranty of merchantability (Count IV); breach of the implied warranty of fitness for a particular purpose (Count V); breach of contract (Count VI); breach of the implied covenant of good faith and fair dealing (Count VII); violation of state consumer fraud statutes nationwide (Count VIII); seeking restitution for unjust enrichment (Count IX); and seeking "injunctive and equitable relief" (Count X).[9]

_____

[9/]  Counts I, IV, V, IX, and X are asserted by all plaintiffs, individually and on behalf of the classes, against all defendants.  Counts II, VI, and VII are asserted by all plaintiffs, individually and on behalf of the classes, against the carrier defendants.  Count III is asserted by plaintiffs Advanced Systems

1. **Injury**

Defendants' first contention is that all of plaintiffs' claims must be dismissed because plaintiffs have failed to allege a legally cognizable injury. Defendants assert that "*no* plaintiff here alleges that he or she ever even attempted to make a 911 call with a phone manufactured or sold by defendants, let alone suffered an injury as a result of a 911 call that was not processed in the manner required by FCC regulations." (Memorandum in Support of Motion to Dismiss at 8.) In defendants' view, "the Amended Complaint amounts to a request for protection from, and compensation for, possible future harm--the possibility that, one day, a wireless telephone user might attempt to connect to a 911 operator and be unable to complete a call within a particular time frame." (Id. at 3.) Because none of the plaintiffs have alleged that they tried to make a 911 call and failed to get through, the argument goes, plaintiffs have failed to allege that defendants' phones "exhibit" or "manifest" any defect.

Plaintiffs argue that they have suffered injury under both federal and state law because they "purchased phones that do not function the way they are supposed to function, and an FCC-

---

Integration, Inc. ("ASI"), Hubbard, Viengvilay, Lee, Nguyen, McAneny, and Freeland, individually and on behalf of the subclasses (except the Kyocera subclass) and the general public of the state of California and affected members thereof, against all defendants except Kyocera Corporation ("Kyocera"). Count VIII is asserted by all plaintiffs (except for ASI), individually and on behalf of the classes, against all defendants. Count XI is asserted by plaintiff Clarke, individually and on behalf of the Kyocera class and the general public of the state of California and affected members thereof, against Kyocera.

compliant phone is worth more than an FCC-noncompliant phone. . .
. In this case the defect <u>has</u> 'manifested' in each and every phone
which does not contain the mandated software.  The fact that this
defect has not resulted in a plaintiff's failure to reach 911 does
not mean there is no damage." (Memorandum in Opposition to Motion
to Dismiss at 10-11.)

We agree with plaintiffs.  It is plain that they have
adequately alleged that they have been injured by purchasing cell
phones that do not operate in accord with FCC requirements for
processing 911 calls and are therefore worth less than compliant
phones.  We certainly could not hold as a matter of law that a
noncompliant phone has as much value as a compliant one.
Plaintiffs are entitled to the opportunity of proving this
allegation of diminished value.  The cases cited by defendants are
distinguishable because they involved products that are not
analogous to cell phones, such as automobiles, and/or products that
were alleged to be "prone" to defects but had not yet manifested a
defect.  Here, plaintiffs have alleged that the phones at issue do
not process 911 calls in the required ways and thus are defective.
Any diminished value of such phones would not be "speculative," as
defendants claim.  We reject defendants' contentions that
plaintiffs must actually have tried to dial 911 on their cell
phones and failed to get through in order to state a cognizable
injury.

## 2.  **Enforceable FCC Order**

Defendants also argue that plaintiffs' Communications Act claims fail because the Second Report and Order "is prospective and more akin to a general rulemaking than to a rule that *requires specific* action by *specific* parties." (Reply at 11.) Moreover, defendants contend, plaintiffs do not have standing to assert a Communications Act claim because they were not "parties" to the proceedings that resulted in the Second Report and Order. Section 401(b) of the Communications provides:

> If any person fails or neglects to obey any order of the Commission other than for the payment of money, while the same is in effect, the Commission or any party injured thereby, . . . may apply to the appropriate district court of the United States for the enforcement of such order. If, after hearing, that court determines that the order was regularly made and duly served, and that the person is in disobedience of the same, the court shall enforce obedience to such order by a writ of injunction or other proper process, mandatory or otherwise, to restrain such person or the officers, agents, or representatives of such person, from further disobedience of such order, or to enjoin upon it or them obedience to the same.

47 U.S.C. § 401(b).

Defendants' first argument, that the Second Report and Order simply sets out rules of "general applicability" and does not "contain any specific directive, explicit, or implicit, to any of the defendants in this case," (Memorandum in Support of Motion to Dismiss at 10-11), thereby rendering it unenforceable, is simply incorrect and in fact borders on the absurd. The Second Report and

Order (read in conjunction with the Clarification Order) requires that cell phones operating in analog mode process 911 calls in specific ways. Whom does the Second Report and Order contemplate is responsible for ensuring that the phones do so? Manufacturers and, to some extent, carriers--those involved in the production and design of the phones and their software.[10] That the Second Report and Order does not expressly refer to those entities *by name* does not demonstrate that the Second Report and Order was not a directive to certain parties to take specific actions, nor does it render the Second Report and Order "poorly suited for enforcement," as defendants assert.

Defendants' second argument, that the plaintiffs do not qualify under § 401(b) as "part[ies] injured thereby" because plaintiffs were not parties to the FCC proceedings that produced Second Report and Order, is really just a version of the first argument. The thrust of both of defendants' contentions is a position that they claim to disavow (because it is the minority view and contrary to Seventh Circuit precedent)[11]--that orders

_____

[10]/ For a more detailed discussion regarding the carrier defendants, see *infra* section C.

[11]/ In Illinois Bell Telephone Co. v. Illinois Commerce Commission, 740 F.2d 566 (7th Cir. 1984), the Seventh Circuit did not discuss the rulemaking/ adjudicatory distinction specifically, but it affirmed the entry of an injunction under § 401(b) to enforce an order that was the product of rulemaking. Other Courts of Appeals, such as the Sixth and Ninth Circuits, have expressly held that a decision resulting from a rulemaking proceeding constitutes an "order" within the meaning of § 401(b). See Alltel Tennessee, Inc. v. Tennessee Pub. Serv. Comm'n, 913 F.2d 305, 308 (6th Cir. 1990); Hawaiian Tel. Co. v. Public Utils. Comm'n, 827 F.2d 1264, 1271 (9th Cir. 1987).

produced by FCC "rulemaking" proceedings, as opposed to "adjudicatory" proceedings, cannot be enforced pursuant to § 401(b). Defendants rely on <u>New England Telephone & Telegraph Co. v. Public Utilities Commission</u>, 742 F.2d 1 (1st Cir. 1984), in which the court held that the word "order" in § 401(b) does not include FCC rulemaking decisions, for the proposition that plaintiffs must have been parties to the FCC proceedings in order to bring suit to enforce the Second Report and Order. At the same time, though, defendants concede that "[t]his is not to say that FCC rulemakings are never enforceable under Section 401(b). Most enforceable rulemakings are cases involving rate-making or similar activities, where the FCC has historically availed itself of rulemaking processes." (Memorandum in Support of Motion to Dismiss at 9-10.) The Second Report and Order is different from those "enforceable rulemakings," say defendants, because it does not require specific action of specific parties. We have rejected that contention.

### 3. **Fraud**

Defendants contend that plaintiffs' state-law consumer fraud claims in Counts III, VIII, and XI must be dismissed because they are not pled with the particularity required by Federal Rule of Civil Procedure 9(b). Rule 9(b) provides that "[i]n all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity." Plaintiffs respond that their

claims are "not necessarily subject to the strictures of Rule 9(b)" because "plaintiffs must plead with particularity only those claims which are grounded in fraud." (Memorandum in Opposition to Motion to Dismiss at 14-15.) Because the consumer fraud statutes encompass a broad range of conduct, plaintiffs assert, fraud is not a necessary element of recovery, and the claims need not be pled with particularity.

Counts III and XI of the amended complaint allege that defendants engaged in "fraudulent business practices," and Count VIII alleges that defendants engaged in a "deceptive" practice. Therefore, those claims are at least in part grounded in fraud, and plaintiffs must plead them with particularity--the who, what, when, where, and how of the alleged fraud, see <u>Katz v. Household International, Inc.</u>, 91 F.3d 1036, 1040 (7th Cir. 1996). Given that "[a]ccusations of fraud can do serious damage to the goodwill of a business firm," the Seventh Circuit has commented that the "true rationale" of Rule 9(b) is to discourage litigants "from tossing such accusations into complaints in order to induce advantageous settlements or for other ulterior purposes." <u>Bankers Trust Co. v. Old Republic Ins. Co.</u>, 959 F.2d 677, 683 (7th Cir. 1992). This rationale applies equally to both common-law and statutory fraud claims. <u>See</u> <u>Petri v. Gatlin</u>, 997 F. Supp. 956, 973 (N.D. Ill. 1997) (Grady, J.).

Accordingly, Counts III, VIII, and XI of the amended complaint will be dismissed without prejudice because they do not comply with Rule 9(b).  Plaintiffs will be given leave to amend the complaint to allege fraud with specificity.

### 4.    Implied Warranty of Merchantability/ Fitness for a Particular Purpose

Defendants maintain that plaintiffs' claims for breach of the implied warranty of merchantability and breach of the implied warranty of fitness for a particular purpose should be dismissed for lack of privity.  According to defendants, the "general rule" is that privity of contract is required in an action for breach of implied warranty.  Defendants cite case law and statutes from several states supporting this proposition.  Plaintiffs concede that ten states require privity of contract between consumer and manufacturer, but they argue that the majority of states either have abolished the privity requirement or recognize exceptions to the requirement that would apply here.[12]

It is clear to us that the laws of the states on the privity requirement differ and that because of the exceptions to the requirement in some states, it would be impossible for us to state a general rule that would be useful.  We see no need, then, for us, the transferee court in this MDL, to address the issue on a state-by-state basis.  It is a case-specific question that should await

---

[12]/    Attached to plaintiffs' memorandum in opposition to the motion to dismiss is a survey of the law of fifty states and the District of Columbia regarding the privity requirement.

the attention of the transferor courts on remand. We will, however, address the issue as it arises in our own case that is part of the MDL, <u>Aggarwal v. Nokia</u>, 02 C 8808.

The <u>Aggarwal</u> case involves the application of Illinois law. Defendants cite Seventh Circuit case law stating that privity is a prerequisite to recover economic damages for breach of implied warranty, <u>Voelker v. Porsche Cars N. Am., Inc.</u>, 353 F.3d 516, 525 (7th Cir. 2003). Plaintiffs argue that the Illinois Supreme Court, in <u>Rothe v. Maloney Cadillac, Inc.</u>, 518 N.E.2d 1028 (Ill. 1988) (relying on <u>Szajna v. General Motors Corp.</u>, 503 N.E.2d 760 (Ill. 1986)), has interpreted federal law--the Magnuson-Moss Act--to allow suits for implied warranties by plaintiffs who, as here, have been issued express warranties by the manufacturer.

The weight of authority in this district has rejected the Illinois courts' interpretation of federal law. We adopt the analysis of our colleague, Judge Bucklo, who recently confronted this issue:

> [W]hile I must follow the Illinois Supreme Court's interpretation of Illinois law, <u>Highsmith v. Chrysler Credit Corp.</u>, 18 F.3d 434, 442 (7th Cir. 1994), I need not be bound by its interpretation of federal law. <u>RAR, Inc. v. Turner Diesel, Ltd.</u>, 107 F.3d 1272, 1276 (7th Cir. 1997). The Seventh Circuit in <u>Voelker</u> held that privity was required. 353 F.3d at 525. While plaintiffs argue that <u>Voelker</u> did not explicitly address the issue raised by <u>Szajna</u>, I must follow Seventh Circuit pronouncements. In addition, several district courts have rejected the <u>Szajna</u> Court's interpretation of Magnuson-Moss. <u>E.g.</u>, <u>Kutzler v. Thor Indus., Inc.</u>, No. 03-C2389, 2003 WL 21654260, at *6 (N.D. Ill. July 14, 2003) (Schenkier, J.); <u>Soldinger v. Aston Martin LaGonda</u>

of N.A., Inc., No. 97-C7792, 1999 WL 756174, at *6-10
(N.D. Ill. Sept. 13, 1999) (Pallmeyer, J.).  I agree with
their conclusion.

Finch v. Ford Motor Co., 327 F. Supp. 2d 942, 945-46 (N.D. Ill.

2004) (holding that plaintiffs lacked the necessary privity of

contract with the manufacturer for a breach of implied warranty

claim); see also Soldinger, 1999 WL 756174 at *6-10 (explaining why

the privity requirement is not eliminated under the Magnuson-Moss

Act if it is required for a breach of implied warranty claim under

Illinois law).   The breach of implied warranty claims in the

Aggarwal case, therefore, will be dismissed with prejudice for lack

of privity.

In addition to the privity issue, defendants present related

arguments for dismissal of the implied warranty claims, none of

which is persuasive. Defendants first imply that plaintiffs fail to

allege that defendants' phones are not fit for the ordinary

purposes for which they are used because making 911 calls is not an

"ordinary purpose."[13]  As plaintiffs point out, it is a stretch to

argue that making 911 calls is not an ordinary purpose for which

cell phones are used.   The amended complaint alleges that

defendants' phones do not comply with FCC regulations and are

_____

[13]/   "To prove a breach of an implied warranty of fitness for particular
purpose, a plaintiff must show (1) a sale of goods, (2) that the seller had
reason to know of any particular purpose for which the goods are required, (3)
that plaintiff, as buyer of the goods, was relying upon seller's skills or
judgment to select suitable goods, and (4) that the goods were not fit for the
particular purpose for which they were used." Maldonado v. Creative Woodworking
Concepts, Inc., 796 N.E.2d 662, 666 (Ill. App. Ct. 2003).

therefore not fit for making 911 calls.  (Consolidated Amended
Class Action Complaint, ¶ 70.)  That is sufficient.  We also reject
defendants' contention that plaintiffs' claims fail because there
is no express allegation that the cell phones in question do not
make 911 calls; a reasonable inference from the allegation that the
phones do not comply with FCC regulations is that the phones do not
properly make 911 calls.  We also reject defendants' argument that
plaintiffs have not adequately alleged that they relied on the
defendants' knowledge for purposes of the warranty of fitness for
a particular purpose.  That the plaintiffs relied upon defendants'
skills or judgment to provide suitable phones is a reasonable
inference from the language of the complaint, which alleges that
defendants were obligated to use their skill and knowledge and that
plaintiffs were entitled to rely on it.  (Consolidated Amended
Class Action Complaint, ¶ 68.)

Defendants' motion to dismiss the implied warranty claims will
be denied without prejudice to renewal of the motions in the
transferor districts after remand, except as to the implied
warranty claims in the Aggarwal case, which will be dismissed with
prejudice.

## C.  Carrier Defendants' Motion to Dismiss

In addition to the arguments set forth in defendants' general
motion to dismiss, the "carrier defendants," Cellco Partnership
d/b/a Verizon Wireless, AT & T Wireless Services, Inc., and Sprint

Spectrum L.P. d/b/a Sprint PCS, argue that the FCC has "made it
clear" that the Second Report and Order applies only to the
manufacturer defendants and not to them.  The carriers seize upon
the text of the regulation that was amended by the Second Report
and Order:

> Mobile telephones *manufactured after* February 13, 2000
> that are capable of operating in [ ] analog mode . . .
> must incorporate a special procedure for processing 911
> calls.  Such procedure must recognize when a 911 call is
> made and, at such time, must override any programming in
> the mobile unit that determines the handling of a non-911
> call and permit the call to be transmitted through the
> analog systems of other carriers.  This special procedure
> must incorporate one or more of the 911 call system
> selection processes endorsed or approved by the FCC.

47 C.F.R. § 22.921 (emphasis added).  In the carriers' view, this
language unambiguously imposes duties only "at the handset
manufacturing stage and not on the sale of the handsets or the
provision of wireless cellular services."  (Memorandum in Support
of Carrier Defendants' Motion to Dismiss at 3-4.)  The carriers
contend that there is no provision in the Second Report and Order
assigning them responsibility for "implementation or roll out of
the new 911 call-processing technologies," and they quote from
passages in the Second Report and Order and related orders that
refer to imposing 911 call-processing requirements on "handset
manufacturers" and allowing reasonable time for "handset
manufacturers" to comply with the requirements.  (Id. at 4-7.)
Another indication that the Second Report and Order applies only to
manufacturers, say the carriers, is the fact that the FCC has

issued orders subsequent to the Second Report and Order granting manufacturers' requests for alternative call-processing technologies, but no such orders with respect to carriers.

We find the carriers' arguments unpersuasive. The language of the pertinent FCC regulation, 47 C.F.R. § 22.921, refers to phones "manufactured after" a certain date; this is simply a limitation on the phones to which the regulation applies. It does not give us much insight on whether the Second Report and Order imposes any duties on carriers, and it certainly does not "clearly" indicate that the FCC intended the Second Report and Order to apply to manufacturers only.

Similarly, we believe that the FCC's subsequent orders pertaining to manufacturers' alternative call-processing requests are of little relevance. That no carriers have filed requests for approval does not tend to show that FCC intended the Second Report and Order not to apply to carriers at all. And in fact, the carriers' argument is undercut by the FCC's invitation to both manufacturers and carriers to submit such requests: "Manufacturers or carriers wishing to incorporate new or modified 911 call processing modes may submit such requests to the Wireless Telecommunications Bureau, and we delegate authority to the Bureau to act on such requests." (Second Report and Order, ¶ 88.)

The best way to tackle this issue is to look at the Second Report and Order itself and the realities of 911 call processing it

contemplates.  The excerpts quoted by the carriers do not indicate that *only* manufacturers are bound by the order.  Moreover, several portions of the Second Report and Order refute the carriers' argument that they are not subject to the order.  Appendix C to the Second Report and Order, the "Final Regulatory Flexibility Analysis," states under the heading "Description and Estimate of Small Entities *Subject to the Rules*"[14] (emphasis added):

> *Cellular Equipment Manufacturers.*  The actions taken in the [Second Report and Order] will chiefly apply to manufacturers of cellular equipment offering analog services or digital equipment also offering analog services.
> . . .
> *Cellular Carriers.*  Cellular carriers are also impacted by the Commission's decision in this proceeding.

The section does not include any other categories of entities "[s]ubject to the Rules."  Thus, it appears that although the FCC contemplated that manufacturers would be primarily responsible for implementing the call-processing modes, carriers would also have implementation duties.  Other language of the Second Report and Order that refers to carriers supports this conclusion:

- [W]e . . . anticipate that other methods [of complying with these rules] could be developed in the future.  Thus, no manufacturer *or carrier* is required to employ any specific patented technology.

_____

[14]/ Page 36 of the Second Report and Order states: "As required by Section 603 of the Regulatory Flexibility Act, the Commission has prepared a Final Regulatory Flexibility Analysis of the expected impact on small entities of the changes in our rules adopted herein.  The Final Regulatory Flexibility Analysis is set forth in Appendix C."

- A nine month deadline should allow manufacturers to make the programming changes in handsets, test the updated handsets, and revise the handset manuals. . . . We also believe the nine month period will allow *carriers* and PSAPs sufficient time to plan for changes in 911 calling patterns and make any other needed adjustments.

- We encourage *carriers* and manufacturers to act voluntarily, based upon the objectives we have stated in this Order, to extend 911 performance improvements.

(Second Report and Order, ¶¶ 66, 87, 90 (emphasis added).)

The Second Report and Order also describes the realities of the complex wireless phone industry, in which manufacturers and carriers work in conjunction to provide phones that comply with FCC regulations:

One reason access to emergency 911 systems is not always available for wireless handsets is that there are gaps in the signal coverage provided by wireless carriers. . . .
Two cellular carriers usually provide service in each market, referred to as the A carrier and the B carrier. Each A carrier uses one set of assigned frequencies and each B carrier another, but both use compatible technology and air interface standards for analog service. Cellular handsets are manufactured to be used for both A and B carrier systems, and software programs in these handsets permit them to operate in several modes. . . .
[C]arriers are major distributors of handsets . . . . [D]irect sales from carriers account for about 24 percent of cellular sales . . . .

(Second Report and Order, ¶¶ 14, 20, 83.) As plaintiffs point out, the language of the Second Report and Order shows that carriers play a role in bringing cell phones to market (the extent of that role, however, is a factual question). Given the text of the

Second Report and Order, especially the provisions quoted <u>supra</u>, we must reject the carriers' contention that the Second Report and Order does not apply to carriers.

Regarding plaintiffs' state-law claims, the carriers assert what appears to be a preemption argument: "[P]laintiffs' attempt to invoke state law would contravene the FCC's manufacturer-focused 911 call-processing regime." (Memorandum in Support of Carrier Defendants' Motion to Dismiss at 9.) The problem is that the carriers cite no case law supporting their argument, and they fail to explain why the following "saving clause" provision of the Communications Act does not apply: "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 47 U.S.C. § 414. The preemption argument is therefore rejected.

The carriers also contend that three of the state-law claims --breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment--must be dismissed as improperly pled. The carriers cite case law from several states. As with defendants' general motion to dismiss, these are case-specific questions that will best be handled by the transferor courts on remand. We will deny the motion on these issues, without prejudice to renewal. We will address these claims only as to our own case, <u>Aggarwal</u>, which involves Illinois law.

As for breach of contract, the carriers cite only California and Texas law for their contention that to assert a claim of breach of contract, a plaintiff must allege a breach of some obligation arising out of the contract. Plaintiffs respond that their claim is proper because their contracts with the carriers incorporate, by implication, the FCC's cellular phone regulations. Plaintiffs cite Illinois law for the proposition that law existing at the time and place of the making of a contract "necessarily enters into and forms part of every contract as if specifically incorporated therein." <u>Schiro v. W.E. Gould & Co.</u>, 165 N.E.2d 286, 290 (Ill. 1960). The carriers attempt to avoid this rule by arguing that the FCC's regulations should not be incorporated into the contracts because they do not apply to carriers, but we have already considered and rejected that argument.

The carriers also maintain that Illinois does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing. It is true that Illinois does not recognize such an independent cause of action *in tort*, but a contractually-based claim for breach of the implied covenant does exist. <u>See, e.g.</u>, <u>Puthusserill v. Shell Oil Co.</u>, No. 02 C 2289, 2003 WL 22494790, at *2-3 (N.D. Ill. Nov. 4, 2003). The claim, however, boils down to breach of contract: "[T]he obligation to deal in good faith is implied by Illinois law into every contract and breach of that duty is simply a breach of the underlying

contract." Batteast Constr. Co. v. Public Bldg. Comm'n, 195 F. Supp. 2d 1045, 1051 (N.D. Ill. 2001). Plaintiffs have already asserted a separate breach of contract claim in Count VI. Their claim for breach of the implied covenant of good faith and fair dealing, then, is superfluous, see id., and will be dismissed from the Aggarwal case.

The carriers' final argument regarding the state-law claims is that an unjust enrichment claim does not lie where there is a contract between the parties. Plaintiffs contend that they may plead unjust enrichment in the alternative. In the amended complaint, however, unjust enrichment is not pled in the alternative, nor is it pled in the alternative in the Aggarwal case. Plaintiffs' unjust enrichment claim will be dismissed without prejudice, and plaintiffs will be given leave to replead unjust enrichment in the alternative.

We decline to address the carriers' argument that plaintiffs' failure to identify a specific violation of the Communications Act dooms their §§ 206 and 207 claims, because it is raised for the first time in their reply brief and is therefore waived. See APS Sports Collectibles, Inc. v. Sports Time, Inc., 299 F.3d 624, 631 (7th Cir. 2002); Petri, 997 F. Supp. at 981 n.18.

Accordingly, the carrier defendants' motion to dismiss will be granted in part, to the extent that plaintiffs' unjust enrichment claim will be dismissed without prejudice and that the claim in

Aggarwal for breach of the implied covenant of good faith and fair dealing will be dismissed with prejudice. The remainder of the motion is denied.

**D.   Nokia, Inc.'s Motion to Dismiss**

There are two Nokia entities involved in this litigation: Nokia, Inc., a U.S. corporation ("Nokia, Inc."), and Nokia Corporation, a Finnish corporation ("Nokia Corp."). Nokia, Inc. moves to dismiss the amended complaint on the basis that it is not subject to the Second Report and Order. (The motion of Nokia Corp., which is discussed _infra_ section E, is premised on insufficiency of service of process.)

In the Second Report and Order, as quoted _supra_ section C, the FCC invited manufacturers and carriers wishing to incorporate new or modified 911 call-processing modes to submit such requests to the Wireless Telecommunications Bureau (the "Bureau"), and the FCC delegated authority to the Bureau to act on such requests. Nokia, Inc. filed such a request, which was approved by the Bureau in a January 28, 2000 order that we will call the "Nokia Order." Nokia, Inc. contends that all claims against it must be dismissed because its handsets are governed solely by the Nokia Order and the amended complaint alleges that defendants violated only the Second Report and Order with no mention of the Nokia Order.

Plaintiffs, on the other hand, contend that the Second Report and Order does apply to Nokia even though the alternative call-

processing mode was approved in the Nokia Order.  Plaintiffs argue
that "[w]hile Nokia is correct in stating that its 911 calling
obligations are governed by the *Nokia Order*, Nokia's corollary
contention--that it is not subject to any of the requirements set
forth in the *Second Report and Order*--is erroneous." (Memorandum
in Opposition to Nokia, Inc.'s Motion to Dismiss at 2.)    In
plaintiffs' view, the Nokia Order incorporated the three tasks
required of cellular phones by the Second and Report and Order, as
set forth in the amended complaint.  Paragraphs 40 and 41 of the
amended complaint allege:

> 40.  Under  the  Second  Report  and  Order  and  the
> [Clarification Order], when an emergency call is placed:
>      a)  If a cell phone attempting to place a 911 call
> does not detect a signal from the preferred carrier, it
> must switch to the non-preferred carrier and attempt to
> complete the call;
>      b)   If the cell phone detects a signal from the
> preferred carrier but is not assigned a voice channel
> within 17 seconds, it must switch to the non-preferred
> carrier and attempt to complete the call; and
>      c)  If a wireless 911 call is completed but dropped,
> the cell phone must automatically retry the call.
>
> 41.  Many of the cell phone models manufactured after
> February 13, 2000 and marketed to the U.S. public by
> defendants have failed, and continue to fail, to satisfy
> at least one of the requirements set forth above.  At all
> times relevant hereto, defendants have concealed from
> purchasers of the cell phone models in question, and have
> not disclosed to them or any of them, that the said cell
> phone models were non-compliant.

(Consolidated Amended Class Action Complaint, ¶¶ 40-41.)

To determine whether Nokia, Inc. is subject to the Second Report and Order, we turn to the relevant language of the Nokia Order:

> In its *Second Report and Order* in the Wireless E911 Rulemaking, . . . the Commission adopted Section 22.921 of its rules, 47 C.F.R. § 22.921. To help improve 911 call completion, this rule requires new analog wireless handsets, and multimode handsets when operating in analog mode, to be able to complete 911 calls to either analog carrier in an area, regardless of the programming of the handset for non-911 calls. . . . Further, the Commission approved three proposed 911 call processing modes, while stating general principles for other acceptable modes and encouraging the development of further improvements in 911 call completion . . . .
>
> . . .
>
> On October 27, 1999, Nokia, Inc. filed a letter with the Bureau requesting approval for an alternate 911 call completion method for Nokia's multi-mode products . . . . *Nokia describes its method as based on the Automatic A/B Roaming-Intelligent Retry (A/B-IR) method approved in the Second Report and Order*, but going further to attempt call completion on all systems on which a handset is capable of operating, including both analog and digital modes.
>
> . . .
>
> In a Public Notice in this docket, the Bureau sought comment on this proposal, *in particular on whether the proposed method is consistent with the Commission's rules and the principles set out by the Commission for 911 call processing modes*.
>
> . . .
>
> Based on our review of the Nokia request and the record, we approve Nokia's proposed 911 call completion method, *subject to the same two conditions that the Commission imposed in the Second Report and Order to address lock-in concerns associated with the A/B-IR call completion method. First, the handset must provide effective feedback* . . . .
>
> *Second, the Commission required that handsets employing A/B-IR seek to complete the call with the non-preferred cellular carrier if the preferred cellular carrier has not successfully delivered the call to the landline carrier within 17 seconds after the call is placed.* . . . Nokia's original proposal did not specifically provide

that the call be delivered to the landline carrier within
17 seconds. . . . Subsequently, Nokia clarified that its
multi-mode handsets *will comply with the time limits for
access attempts approved by the Commission for the A/B-IR
method, specifically the 17-second limit . . . .
Applying the same 17-second limit to Nokia's proposal as
that applied by the Commission to the substantially
similar A/B-IR method should similarly address lock-in
concerns.*
. . .
[W]ith Nokia's proposed method, if attempts to complete
the 911 call via the [Preferred Roaming List] fail, the
handset would then attempt to complete the call with non-
preferred carriers, including the local non-preferred
analog carrier.
. . .
Subject to the two conditions, we find that Nokia's
proposed method will satisfy both the Commission's
general principles for 911 call processing modes and the
specific conditions the Commission imposed upon the
Automatic A/B Roaming-IR mode on which the Nokia proposal
is based.
. . .
Accordingly, we approve the proposed Nokia 911 call
completion method for multimode handsets, *subject to the
conditions imposed by the Commission for feedback and
time limits for the Automatic A/B Roaming-IR mode.*

(Nokia Order, ¶¶ 1-5, 10-12 (emphasis added).)[15]

Thus, the language of the Nokia Order refutes Nokia, Inc.'s

contentions that the Second Report and Order does not apply to

Nokia handsets. The Nokia Order explicitly incorporates the Second

Report and Order and the 17-Second Rule, which is one of the three

---

[15]/ Nokia, Inc. requests that we take judicial notice of several documents-
-those relating to past FCC proceedings, the docket and file in some of the
pending MDL cases, and a patent issued for a particular calling technology.
Plaintiffs request that we take judicial notice of the Request for Approval that
led to the Nokia Order. We recognize that we can take judicial notice of matters
of public record, but we do not find these documents relevant to the question of
whether the Second Report and Order applies to Nokia, Inc. The question is not
very complex and is answered by a simple review of the Nokia Order. In fact,
Nokia, Inc., has inundated the court with numerous exhibits in relation to this
motion that are of marginal relevance.

requirements for call processing cited by plaintiffs in paragraph 40 of the amended complaint. The argument that this lawsuit is "groundless" as against Nokia, Inc. because the Second Report and Order does not apply to it (and the corollary argument that attorneys' fees and costs are warranted) is without merit.

We do believe, however, that the amended complaint requires some clarification with respect to Nokia, Inc. We view the Nokia Order as an extension or amplification of the Second Report and Order. Because the Nokia Order approves an alternative call-processing method for Nokia, Inc., it changes the parlance of call processing with regard to Nokia, Inc.'s method. (For example, Nokia, Inc.'s call-processing method encompasses different concepts, such as the "presently acquired system" and the "preferred roaming list.") Because the amended complaint does not allege that Nokia, Inc. violated the Nokia Order and does not even refer to the Nokia Order, it is unclear from the allegations exactly what requirements plaintiffs believe are applicable to Nokia handsets and what violations of those requirements are alleged. Nokia, Inc. is entitled to adequate notice of the claims against it in light of the applicability of the Nokia Order. Therefore, Nokia, Inc.'s motion to dismiss will be granted, and plaintiffs' claims will be dismissed without prejudice as against Nokia, Inc. Plaintiffs will be given leave to amend the complaint to re-allege their claims as against Nokia, Inc., taking into

account the existence and language of the Nokia Order and conforming the allegations accordingly.

Nokia, Inc. also raises essentially the same preemption argument that was asserted by the carriers and that we rejected <u>supra</u> section C.  We reject it again.

**E.    Nokia Corp.'s Renewed Motion to Dismiss for Insufficiency of Service of Process**

Nokia Corp. contends that its has not been properly served as a foreign corporation.  Prior to the consolidation of these matters by the Judicial Panel on Multidistrict Litigation, Nokia Corp. was named as a defendant in two of the underlying lawsuits: the <u>Aggarwal</u> case, which we have already mentioned, is pending before this court, and <u>McMurry v. Nokia Corp.</u>, a case from the Western District of Washington.  On December 16, 2002, plaintiffs attempted to serve Nokia Corp. in the <u>Aggarwal</u> case by serving a copy of the complaint on National Registered Agents, Inc. ("National"). National, however, is the registered agent for service of process in Illinois for Nokia, Inc., not Nokia Corp.  Plaintiffs concede that the <u>Aggarwal</u> complaint was "inadvertently served on" Nokia, Inc. rather than on Nokia Corp.  (Opposition to Nokia Corp.'s Renewed Motion to Dismiss at 1.)  On January 21, 2003, Nokia Corp. filed a motion to dismiss the <u>Aggarwal</u> case for insufficient service of process.  In February 2003, plaintiffs requested Nokia Corp. to waive service of process, but Nokia Corp. did not agree. On March 19, 2003, we ordered plaintiffs to obtain service on Nokia

Corp. by May 30, 2003. Thereafter, we decided defendants' primary jurisdiction motion, and in light of our referral of issues to the FCC, we denied Nokia Corp.'s motion to dismiss without prejudice to filing a renewed motion at a later time.

After the FCC issued the Clarification Order, plaintiffs filed the Consolidated Amended Class Action Complaint. Nokia Corp. then filed a renewed motion to dismiss for insufficient service of process. Plaintiffs contend that Nokia Corp. has waived any jurisdictional objections due to its "active[] participat[ion] in these proceedings for purposes other than objecting to jurisdiction." (Opposition to Nokia Corp.'s Renewed Motion to Dismiss at 3.) Plaintiffs cite five instances of such "participation": (1) seeking and agreeing to a June 26, 2003 protective order; (2) defendants' November 2004 general motion to dismiss the amended complaint (the motion that is discussed <u>supra</u> section B); (3) defendants' liaison counsel's July and August 2004 letters to the court; (4) defendants' October 2004 discovery requests to plaintiffs; and (5) defendants' January 31, 2003 motion to transfer and consolidate the cases into this MDL proceeding.

Federal Rule of Civil Procedure 12(h)(1) provides that "[a] defense of . . . insufficiency of service of process is waived . . . if it is neither made by motion under this rule nor included in a responsive pleading." Plaintiffs do not dispute that Nokia Corp.

raised the defense timely by asserting it with its first filing. The defense, nonetheless, may be waived "by submission through conduct." <u>Continental Bank, N.A. v. Meyer</u>, 10 F.3d 1293, 1297 (7th Cir. 1993). All of the conduct purportedly constituting waiver occurred after Nokia Corp.'s filing of the motion to dismiss for insufficiency of process. The question is whether Nokia Corp.'s conduct led plaintiffs to believe that service was adequate and that no such defense was being interposed or that the defense was being abandoned. <u>See</u> <u>Trustees of Cent. Laborers' Welfare Fund v. Lowery</u>, 924 F.2d 731, 732-33 (7th Cir. 1991). We do not think that any of the conduct cited by plaintiffs would lead anyone to believe that Nokia Corp. was abandoning its insufficiency-of-service defense.

The January 2003 motion to consolidate the cases into an MDL proceeding was not brought by Nokia Corp. or signed by anyone on behalf of Nokia Corp. And we do not believe that the fact that the other defendants' motion sought transfer of the <u>Aggarwal</u> case (which was brought against Nokia Corp. and not Nokia, Inc.) could have been reasonably construed by plaintiffs as Nokia Corp.'s abandonment of its insufficient-service defense. (In fact, it was not construed by plaintiffs as such an abandonment because plaintiffs later requested that Nokia Corp. agree to waive service.)

Defendants' general motion to dismiss was brought only "[o]n behalf of all defendants who have been properly served and have appeared in this litigation." (Motion to Dismiss at 4.) Plaintiffs argue that because the motion seeks to dismiss the complaint in its entirety, we should find waiver because "[a]ffirmative relief has . . . been sought on behalf of Nokia [Corp.]." (Opposition to Nokia Corp.'s Renewed Motion to Dismiss at 4.) We are unpersuaded. There is no indication in the motion to dismiss that Nokia Corp. was abandoning its defense, and the signature by liaison counsel only "[o]n behalf of all defendants who have been properly served" is a clear signal that Nokia Corp. was not joining in the motion or abandoning its defense. Indeed, Nokia Corp. filed its renewed motion to dismiss for insufficient service of process on the very same day that the general motion to dismiss was filed.

Liaison counsel's use of the generic term "defendants" in correspondence with the court and in discovery requests similarly does not constitute waiver. Nor does the fact that the discovery requests sought information from, among other plaintiffs, plaintiffs who purchased Nokia phones. Neither of these actions by liaison counsel, who has never purported to represent Nokia Corp., can reasonably be imputed to Nokia Corp.

As for the protective order, page 6 of the signature pages to the order does list counsel "for Nokia Corp., Nokia, Inc." This

signature to the protective order is the only "conduct" that can
fairly be attributed to Nokia Corp. for purposes of the waiver
inquiry.  However, it is not conduct that rises to the level of
waiver.  The protective order in question is narrowly focused: it
states that it is "for the sole purpose of facilitating the limited
discovery" we had permitted of the parties' correspondence with the
FCC that was relevant to the primary jurisdiction issue.  Nokia
Corp.'s participation in the case by virtue of signing the
protective order was for a very limited purpose that in our view
could not reasonably be viewed as an abandonment of its defense.
Moreover, as Nokia Corp. points out, while plaintiffs cite one
Illinois state court case supporting their argument, plaintiffs
cite no federal case law.  This is an issue of federal, not state,
civil procedure.  We find that Nokia Corp. did not waive its
insufficiency-of-service defense.[16]

Plaintiffs contend that even if Nokia did not waive its
defense, service was sufficient because Nokia Corp. was properly
served with the complaint in the McMurry case and because liaison
counsel was served with the Consolidated Amended Class Action
Complaint.  We disagree.  The McMurry complaint was served on
National, which was not authorized to accept service on behalf of
Nokia Corp. in the state of Washington.  Nokia Corp. submits the

---

[16]/  An equitable consideration weighing against waiver is that we denied
Nokia Corp.'s original motion without prejudice to renewal at a later time.  We
had not addressed the merits of the motion and signalled our willingness to do
so at Nokia Corp.'s request.

affidavit of Dennis E. Howarth, President of National, who states that National is not and has never been authorized to accept service on behalf of Nokia Corp. in the state of Washington (just as it does not have that authorization in Illinois) and that all service accepted by National in the McMurry case was as agent for Nokia, Inc. and not for Nokia Corp. Plaintiffs do not offer any evidence to the contrary. And as for service of the amended complaint on defendants' liaison counsel, liaison counsel is not counsel of record for Nokia Corp. and has never been authorized to accept service on Nokia Corp.'s behalf.

Accordingly, we find that Nokia Corp. has not been properly served with the summons and complaint in this matter. We decline, however, to grant the motion to dismiss. Instead, pursuant to Federal Rule of Civil Procedure 4(m), plaintiffs will be given until September 6, 2005 to effect service of process on Nokia Corp.

## CONCLUSION

Defendants' motion for partial summary judgment is granted insofar as it relates to the FCC's clarification of the 17-Second Rule. The decision of the FCC in the Clarification Order is adopted as the law of the case. The motion for partial summary judgment is denied insofar as it seeks judgment on the abandoned allegations regarding the feedback requirement.

Defendants' motion to dismiss the Consolidated Amended Class Action Complaint is granted in part and denied in part. Counts

III, VIII, and XI are dismissed without prejudice.  In addition, the breach of implied warranty claims asserted in the Aggarwal v. Nokia case, 02 C 8808, are dismissed with prejudice.  The remainder of defendants' motion to dismiss is denied.

The carrier defendants' motion to dismiss is granted in part and denied in part.  Plaintiffs' unjust enrichment claim is dismissed without prejudice.  The claim for breach of the implied covenant of good faith and fair dealing asserted in the Aggarwal case is dismissed with prejudice.  The remainder of the carrier defendants' motion to dismiss is denied.

Nokia, Inc.'s motion to dismiss is granted.  Plaintiffs' claims are dismissed without prejudice as against Nokia, Inc.

Nokia Corp.'s motion to dismiss for insufficiency of service of process is denied.  Plaintiffs are given leave to serve Nokia Corp. with process by September 6, 2005.

Plaintiffs are given leave to file an amended complaint by July 5, 2005, to allege the fraud claims with specificity; to plead unjust enrichment in the alternative; and to properly re-allege their claims against Nokia, Inc. to account for the Nokia Order.

DATE:    June 3, 2005

ENTER:   _____

John F. Grady, United States District Judge